# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

**ROSETTUS WEEKS,**

        **Plaintiff,**          Case Number: 2:08-CV-15124

v.          HONORABLE DENISE PAGE HOOD

**MICHIGAN DEPARTMENT OF
COMMUNITY HEALTH,**

        **Defendant.**

## ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**I.   INTRODUCTION**

This matter is before the Court on Defendant's Motion for Summary Judgment **[Docket # 28, filed on December 2, 2009]**. Plaintiff responded on December 31, 2009 **[Docket #33]**. Defendant replied on January 7, 2010 **[Docket #37]**.

**II.   STATEMENT OF FACTS**

This case is a Title VII employment matter in which the Plaintiff alleges retaliation and racial discrimination. Plaintiff, Rosettus Weeks, is an African-American male who has worked for the Michigan Department of Community Health ("MDCH") in several capacities. In 2005, Plaintiff applied for a vacant State Bureau Administrator ("SBA 18") position. Ultimately, Cynthia Kelly, a white female, received the appointment. Subsequently, Plaintiff filed a Technical Complaint under the Michigan Civil Service Rules, challenging Kelly's appointment. Plaintiff's Technical Complaint called into question Kelly's qualifications for the position

1

relative to Plaintiff's, but did not raise any concerns about discrimination. Technical Complaint, Exh. 3 to Defendant's Motion for Summary Judgment. The Civil Service Commission decided Kelly's appointment was, in fact, improper and "that Ms. Kelly did not possess the experience necessary to qualify for the SBA 18." Technical Review Decision, Exh. 6 to Defendant's Motion for Summary Judgment.

Although Kelly was removed from the SBA 18 position, Plaintiff was not given the position. Instead, it remained vacant. Kelly received an SBA 17 position, to which Plaintiff had also applied. Again, Plaintiff filed a technical complaint challenging Kelly's appointment. Plaintiff and MDCH went to mediation, and reached a settlement including an $8,200 gross pay adjustment paid to Plaintiff, as well as an appointment as Director of Walter Reuther Psychiatric Hospital (WRPH). As hospital director, Plaintiff reported to Kelly. According to Defendant, Plaintiff had a working professional relationship with Kelly, even after the technical complaints, and Defendant argues that Plaintiff's primary complaint about Kelly's supervision was that he received disproportionate scrutiny regarding budgets and expenditure approvals.

In September 2007, an incident of alleged patient abuse occurred at WRPH. According to Defendant, Plaintiff undermined the internal investigation of said incident, affecting the ultimate outcome. Further, Defendant maintains that during an unannounced inspection of the hospital by the United States Centers for Medicaid and Medicare Services (CMS), Plaintiff made remarks that the rights of employees take priority over those of the patients. Defendant blames Plaintiff for CMS's order, which placed WRPH in "immediate jeopardy" of losing federal funding and closing down.

Plaintiff alleges that he, single-handedly, formulated the plan under which the

"immediate jeopardy" status was lifted. Defendant disputes this. Two of WRPH's nurses filed EEOC complaints against Defendant, alleging retaliatory behavior by Plaintiff. While Plaintiff states that the complaints were found to be without merit, Defendant states that these complaints were settled with the employees. Subsequently, in 2008, Defendant launched an investigation into allegations of misconduct by Plaintiff, suspending him with pay pursuant to the Civil Service Rules. Defendant claims that at least two other employees had been suspended pending an investigation, including one white male. According to Defendant, the investigation resulted in a determination that Plaintiff had acted inappropriately by undermining an internal investigation, appearing to impede the ORR investigation, demonstrating poor judgment in dealing with the two nurses, failing to respond appropriately to alleged patient abuse, and making inappropriate statements to CMS investigators. As a result, Plaintiff received a written reprimand and, upon returning from his suspension, he was assigned to an SBA 17 position in Lansing, Michigan, approximately 90 miles from his home. In June 2008, Plaintiff filed grievances challenging the written reprimand and the reassignment. The hearing officer issued a decision stating that the reprimand and reassignment did not violate Plaintiff's rights.

In 2008, the SBA 18 position that Kelly had previously been removed from was posted again. Kelly, Plaintiff, and others reapplied, and Kelly was selected for the position. Plaintiff filed a charge of discrimination with the EEOC in September 2008, alleging retaliation and discrimination based on race and national origin.

### III.  APPLICABLE LAW & ANALYSIS

#### A.  Standard for Summary Judgment

Pursuant to Rule 56(c), summary judgment may only be granted in cases where "the

pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The moving party bears the burden of showing no dispute as to any material issue. *Equal Employment Opportunity Comm'n v. MacMillan Bloedel Containers, Inc.*, 503 F.2d 1086, 1093 (6th Cir. 1974). A dispute must be apparent from the evidence in order to deny such a motion. Such a dispute must not merely rest upon the allegations or denials in the pleadings, but instead must be established by affidavits or other documentary evidence. Fed.R.Civ.P. 56(e). When ruling, the Court must consider the admissible evidence in the light most favorable to the non-moving party. *Sagan v. United States of Am.*, 342 F.3d 493, 497 (6th Cir. 2003).

### B. Title VII

Under Title VII, it is "an unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." U.S.C. § 2000e-2(a).

As an initial matter, Defendant argues that Plaintiff is barred from recovering for any alleged violation prior to late 2007, based upon Title VII's bar for recovery for employment discrimination that occurred more than 300 days before Plaintiff filed his EEOC charge. 42 U.S.C. § 2000e-5(e)(1) states that a charge of an unlawful employment practice must be filed within 300 days after the alleged unlawful employment practice occurred. *Risch v. Royal Oak Police Dep't* notes that Title VII bars recovery for employment discrimination that occurred more than 300 days before the EEOC charge. 581 F.3d 383, 387 n.2 (6th Cir. 2009)

Plaintiff argues that these claims are not time-barred, as hostile work environment claims are different than claims based upon discrete acts, and the filing provision only requires Plaintiff to file within 300 days of an act contributing to the overall hostile environment. In this case, however, Plaintiff has not alleged hostile work environment, and the 300-day bar applies. The only claims before the Court are retaliation and racial discrimination under Title VII. The time bar therefore applies, and Plaintiff cannot recover for violations that occurred prior to November 22, 2007.

1. **Plaintiff's Retaliation Claim**

Plaintiff alleges four acts of retaliation: (1) Plaintiff was removed from his position as director of WRPH; (2) Plaintiff applied for a position in May 2008 and the position was given to a white female with lesser qualifications; (3) Plaintiff was transferred to Lansing, approximately 90 miles from his home in June 2008; and (4) Plaintiff was suspended with pay for four months in January 2008.

Plaintiff proffers no direct evidence of retaliation. In the absence of direct evidence of a Title VII violation, the *McDonnell Douglas* burden-shifting analysis applies, under which Plaintiff must first submit evidence from which a reasonable jury could conclude that he established a prima facie case of a Title VII violation. *Risch,* F.3d 383 at 391. If Plaintiff does so, Defendant must offer admissible evidence of a legitimate, nondiscriminatory reason for its action. *Id.* If Defendant succeeds, Plaintiff must identify evidence from which a reasonable jury could conclude that the proffered reason is actually a pretext for unlawful activity. *Id.*

To make out a prima facie case of unlawful retaliation, a plaintiff must demonstrate: (1) that he engaged in activity protected by Title VII; (2) that the exercise of his civil rights was

known by the defendant; (3) that thereafter, the defendant took an employment action adverse to the plaintiff; and (4) that there was a causal connection between the protected activity and the adverse employment action. *Christopher v. Stouder Memorial Hosp.*, 936 F.2d 870, 877 (6th Cir. 1991)(citation omitted). Furthermore, "the burden of establishing a prima facie case in a retaliation action is not onerous, but one easily met." *Nguyen v. City of Cleveland,* 229 F.3d 559, 563 (6th Cir. 2000).

      a.    **Protected Activity**

Parties disagree as to whether Plaintiff engaged in "protected activity." Defendant states that Plaintiff did not raise discrimination, retaliation, or any other classification protected under Title VII. It appears from the original 2005 Technical Complaint ("Technical Complaint") that Plaintiff raised no protected classification. Rather, the Technical Complaint alleges that he was more qualified than Kelly and that "[i]t would appear that factors other than merit, efficiency, and fitness was [sic] the basis for selection." Technical Complaint.

Plaintiff relies on *Abbott v. Crown Motors*, 348 F.3d 537 (6th Cir. 2003), and *Crawford v. Metropolitan Gov't of Nashville and Davidson County*, 129 S. Ct. 826 (U.S. 2009) to argue that his Technical Complaint qualifies as "protected activity." In *Abbott*, the court held that "an employee's participation in an employer's internal investigation in allegations of unlawful discrimination where that investigation occurs pursuant to a pending EEOC charge" constituted "protected activity." *Abbott,* 348 F.3d at 543. Plaintiff's Technical Complaint did not allege on its face any form of discrimination made unlawful under Title VII, nor was it pursuant to a pending EEOC charge. In *Crawford*, the Court considered whether Title VII protection "extends to an employee who speaks out about discrimination not on her own initiative, but in answering

6

questions during an employer's internal investigation." *Crawford,* 129 S. Ct. at 849. While neither Crawford nor Abbott squarely support the proposition that a technical complaint need not explicitly allege on its face activity made unlawful under Title VII, there remains a genuine issue of material fact as to whether Plaintiff's Technical Complaint can be read to allege unlawful discrimination.

### b.  Knowledge by Defendant

A plaintiff must show that the exercise of his civil rights was known by the defendant. *See Stouder Memorial Hosp.*, 936 F.2d at 877. There is no dispute as to whether Defendant, as an institution, was aware of Plaintiff's Technical Complaint. Defendant argues that specific decision makers who reprimanded Plaintiff were not aware of the Technical Complaint. Although Defendant offers no legal support to buttress this construction of the "knowledge" requirement, the argument is unpersuasive on its face. For instance, it is undisputed that Barrie was aware of the Technical Complaint, as he was informed of the finding that Kelly lacked qualifications for the original SBA 18 opening and was involved in Kelly's subsequent appointment to the SBA 17 position. It is undisputed that Barrie was also involved in Plaintiff's suspension. There is clearly at least a genuine issue of material fact as to whether the key supervisors were aware of Plaintiff's Technical Complaint.

### c.  Adverse Employment Action

A plaintiff must show that, after receiving knowledge of a plaintiff's protected activity, an employer took an employment action adverse to the plaintiff. *See Stouder Memorial Hosp.*, 936 F.2d at 877. In *Hollins v. Atlantic Co.,* 188 F.3d 652, 662 (6th Cir. 1999), the Sixth Circuit explained a materially adverse employment decision as follows:

> A materially adverse change in the conditions and terms of
> employment must be more disruptive than a mere inconvenience
> or an alternation of job responsibilities. A materially adverse
> change might be indicated by a termination of employment, a
> demotion evidenced by a decrease in wage or salary, a less
> distinguished title, a material loss of benefits, significantly
> diminished material responsibilities, or other indices that might be
> unique to a particular situation.

De minimus employment actions are not materially adverse, and therefore, are not actionable. *See, e.g., Jacklyn v. Schering Plough Healthcare Prod.,* 176 F.3d 921, 930 (6th Cir. 1999)(holding that "neither requiring plaintiff to work at home while she was recovering from out-patient surgery, nor rejecting computer expenses that previously had been approved, were materially adverse employment actions"); *Kocsis v. Multi-Care Mgmt.,* 97 F.3d 876, 885 (6th Cir. 1996) (holding that "reassignments without salary or work changes do not ordinarily constitute adverse employment decisions in employment discrimination claims"); *Agnew v. BASF Corp.,* 286 F.3d 307, 310-311 (finding that being placed on a performance improvement plan does not constitute an adverse employment action).

Plaintiff alleges four discrete acts of adverse treatment: (1) that he was removed from his position as Director of the WPRH; (2) that a position he applied for in 2008 was given to Kelly, a white female who was less qualified; (3) that he was transferred to Lansing, which was about 90 miles from his home; and (4) that he was suspended four months. Under the facts of this case, the removal and transfer appear to refer to one incident and will be analyzed together.

### i. Denial of Promotion in May 2008

To show that a denial of promotion constitutes an adverse employment decision, Plaintiff must show (1) that he applied for and was qualified for the promotion; and (2) that he was considered for and was denied the promotion. *See Ray v. Oakland County Circuit Court*,

8

355 Fed. Appx. 873, 877 (6th Cir. 2009). Defendant implicitly concedes that Plaintiff was qualified for the SBA 18 position he interviewed and applied for in May 2008. While Defendant emphasizes that Plaintiff only met the minimum job qualifications and was not the "most qualified applicant," Plaintiff must only show that he was qualified. Plaintiff need not show he was the most qualified applicant. Defendant does not dispute that Plaintiff was considered for, was qualified for, and was denied the promotion.

### ii. Transfer to Lansing

Absent salary or work hour changes, reassignments "do not ordinarily constitute adverse employment decisions in employment discrimination claims." *Keeton v. Flying J, Inc.,* 429 F.3d 259, 264 (6th Cir. 2005) (quoting *Koscis,* 97 F.3d at 885). When factors such as the nature of the new responsibilities, qualifications required for the new position, and labor intensity of the new position suggest a *de facto* demotion, physical relocation may nonetheless constitute an adverse employment decision. *See Keeton*, 429 F.3d at 264. In *Keeton*, the plaintiff alleged sexual discrimination on the basis of his relocation to a town approximately 120 miles away from his home. *Id.* at 261. The court held that a jury "could reasonably have found that Keeton's transfer, which increased his commute to the extent that he needed to consider relocation," was an adverse employment action. *But see Policastro v. Northwest Airlines, Inc.,* 297 F.3d 535 (finding that relocation in the absence of a total increase in commute distance or any change in responsibilities or title did not constitute adverse treatment).

After Plaintiff's suspension, he was no longer assigned to WRPH, but assigned to an interim position. Plaintiff was transferred to Lansing, which is approximately 90 miles from his home. Although Plaintiff has not alleged any salary or work hour changes, Plaintiff has alleged

9

changes in the nature of his responsibilities. Defendant disputes these claims by emphasizing that Plaintiff's salary and rank did not change during Plaintiff's transfer to Lansing. Neither side has offered dispositive evidence in support of its claims, therefore a jury could reasonably find that Plaintiff's 90-mile transfer constituted an adverse employment decision. A genuine issue of material fact therefore exists as to whether Plaintiff's relocation constituted an adverse employment decision.

### iii. January 2008 Suspension

Plaintiff alleges that his temporary suspension pending the results of an investigation constituted an adverse employment decision. Defendant has offered no evidence that a suspension pending investigation constitutes a "mere inconvenience" or is "de minimus" as defined above. A suspension by definition clearly entails a significant adjustment of responsibilities. While it is significant that Plaintiff was paid during the suspension period, Defendant offers no legal authority that pay is dispositive of the issue of adverse treatment. Plaintiff has pled sufficient facts for a jury to reasonably find that Plaintiff's suspension constituted an adverse employment decision. Summary judgment is inappropriate here, as a genuine issue of material fact exists.

### d. Causal Connection

A plaintiff must demonstrate a causal connection between the exercise of his or her protected activity and a defendant's adverse employment decision. *See Stouder Memorial Hosp.*, 936 F.2d at 877. When an adverse employment decision occurs within close temporal proximity to the employer's learning of a protected activity, there may be an inference of causal connection. *Mickey v. Zeidler Tool & Die Co.*, 516 F.3d 516, 525 (6th Cir. 2008). But when

10

significant time elapses between when an employer learns of protected activity and when the adverse decision occurs, "the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality." *Id.*

In the case at hand, Defendant argues that there can be no inference of causation because there was no temporal proximity between the Technical Complaint and the adverse employment decisions which Plaintiff alleges occurred in 2008, and because the decision-makers were not the same between the time of the Technical Complaint and the occurrence of the alleged adverse employment decisions. There was a significant lapse of time between Defendant's learning of the Technical Complaint (2005) and the alleged adverse employment decisions in 2008. Notwithstanding this lack of temporal proximity, following the 2006 settlement of Plaintiff's second technical complaint against Kelly's SBA 17 appointment, there were no significant events presenting the opportunity for retaliation until the series of alleged adverse employment decisions in 2008. Barrie was connected with both the initial contest to Kelly's SBA 18 appointment, as well as the 2008 suspension of Plaintiff. The 2008 opening to which Kelly was eventually appointed provided another opportunity for retaliation premised on the original Technical Complaint. There is a genuine issue of material fact as to whether a causal connection exists between the Technical Complaint and the alleged adverse employment decisions of 2008.

      **e.**    **Legitimate, Nondiscriminatory Reasons/Pretext**

Defendant proffers several "business reasons" for its adverse treatment of Plaintiff:

          **i.**    **Declined Promotion**

Regarding its decision to promote Kelly over Plaintiff, Defendant emphasizes Kelly's

11

"(1) extensive knowledge and understanding of the mission, vision, and values of MDCH, (2) exceptional understanding of essential certification and accreditation programs, (3) senior level system-wide management experience, and (4) operational expertise and budgeting aptitude." Def. Motion for Summary Judgment at 25. In contrast, "Plaintiff's background and experience is mainly administrative, with a heavy focus on accounting, finance, and management," and his management experience was limited in large part to "unique correctional settings," and issues of "revenue maximization." *Id.* at 24.

While these proffered business reasons are legitimate on their face, evidence suggests that a reasonable jury might still suspect that these reasons are pretextual. "A plaintiff will usually demonstrate pretext by showing that the employer's stated reason for the adverse employment action either (1) has no basis in fact, (2) was not the actual reason, or (3) is insufficient to explain employer's action." *Risch*, 581 F3d at 391 (quoting *White v. Baxter Healthcare Corp.,* 533 F.3d 381, 393 (6th Cir. 2008)). "A plaintiff may also show pretext by offering evidence which challenges the reasonableness of the employer's decision 'to the extent that such an inquiry sheds light on whether the employer's proffered reason for the employment action was its actual motivation.'" *Risch,* 581 F.3d at 391. (quoting *White,* 533 F.3d at 393).

In 2005, Defendant inappropriately appointed Kelly to the SBA 18 position. Defendant subsequently rescinded Kelly's appointment because Kelly lacked at least two years of required administrative experience. Barrie then appointed Kelly to a newly created grade 17 position in which Plaintiff alleges Kelly performed substantively the same duties required under the rescinded grade 18 position. *See* Exhs. 12 and 13 to Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment. Plaintiff subsequently challenged Kelly's grade

17 appointment, resulting in a settlement award for Plaintiff. It is noteworthy that the grade 18 position remained open for approximately two years until Kelly again filled the position in 2008. Barrie oversaw each appointment in question. Though it does not necessarily compel a conclusion of pretext, this sequence of events reasonably calls into question whether the proffered reasons for Kelly's promotion in 2008 were legitimate, or mere pretext.

### ii. Relocation to Lansing

Defendant defends its lateral reassignment and relocation of Plaintiff by citing Plaintiff's appropriate background for the new position in Lansing. Defendant also relies on the testimony of Michael Head, the Deputy Director who succeeded Barrie, in which Head cites MDCH's need to improve its revenue.

Plaintiff alleges that this explanation for Plaintiff's lateral relocation to Lansing was pretext because Head intended for the assignment to be temporary. The fact that the assignment was temporary does not alone show that Head's stated reason for the reassignment had no basis in fact, was not the actual reason, or was insufficient to explain the action. But Plaintiff alleges that he was given conflicting accounts of the duration of his relocation to Lansing. Plaintiff also alleges that Head's statements about the qualifications needed to serve as a hospital director conflict with Plaintiff's own knowledge of the qualifications of other hospital directors. Those allegations, taken together with the substantial distance between Lansing and Plaintiff's home, reasonably call into question whether the proffered reasons for Plaintiff's relocation to Lansing are reasonable or even the actual reasons for the relocation.

### iii. Suspension With Pay

As for Defendant's January 2008 decision to suspend Plaintiff with pay from his

position as Director of WRPH, Defendant notes that it found "Plaintiff's continued presence at WRPH during the investigation was inappropriate." This finding appears to be based at least in part on allegations of misconduct on the part of Plaintiff, specifically allegations of misconduct from employees, as well a CMS survey that determined the hospital was in serious jeopardy of losing federal funding. Defendant also points to the testimony of HR Director Collins that during his tenure at MDCH, he was aware of at least two other MDCH employees at Plaintiff's level who were suspended pending investigation, and that one of them was Caucasian.

By November 17, 2007, the workplace harassment claims against Plaintiff appear to have been resolved and discredited. It also appears that Barrie knew as of January 7th or 8th that WRPH's "immediate jeopardy" status had been lifted. Based on this timeline, a reasonable jury might question whether the appropriateness of Plaintiff's presence was the actual reason for the suspension. If Plaintiff's presence was inappropriate, it would have been least appropriate while the allegations of misconduct were still under investigation and while the hospital was still in "immediate jeopardy."

Regarding Plaintiff's suspension and failure to be promoted, the Court therefore finds that Plaintiff offers evidence on which basis a reasonable jury could find that Defendant's proffered reasons for its adverse employment decisions were pretextual, such that summary judgment is improper.

    **2.**     **Plaintiff's Discrimination Claim**

Plaintiff alleges three discrete acts of adverse treatment: (1) Plaintiff was suspended from his position as Director of WPRH; (2) Plaintiff applied for a position that was given to a white female with lesser qualifications in May 2008; and (3) Plaintiff was transferred to

14

Lansing, about 90 miles from his home, in June 2008.

Plaintiff proffers no direct evidence of discrimination. In the absence of direct evidence of unlawful discrimination, the *McDonnell Douglas* burden-shifting analysis applies, under which Plaintiff must first submit evidence from which a reasonable jury could conclude that he established a prima facie case of a Title VII violation. *See Risch,* F.3d 383 at 391. If Plaintiff does so, Defendant must offer admissible evidence of a legitimate, nondiscriminatory reason for its action. *Id.* If Defendant succeeds, Plaintiff must then identify evidence from which a reasonable jury could conclude that the proffered reason is actually a pretext for unlawful activity. *Id.*

To make out a prima facie case of disparate treatment Plaintiff is required to show that: (1) he is a member of a protected class; (2) he was subjected to an adverse employment decision; (3) he was qualified for the position; and (4) he was replaced by a person outside the protected class, or similarly situated non-protected employees were treated more favorably. *Peltier v. United States*, 388 F.3d 984, 987 (6th Cir. 2004).

    **a.**    **Protected Class**

The parties do not dispute that Plaintiff is a member of a protected class under Title VII.

    **b.**    **Adverse Employment Decision**

For the same reasons set forth in the retaliation discussion above, there is a genuine issue of fact as to whether each incident constitutes an adverse employment decision.

    **c.**    **Similarly-Situated to Non-Protected Employee**

Plaintiff must show that he was replaced by a person outside the protected class, or similarly situated non-protected employees were treated more favorably. *Peltier*, 388 F.3d at

15

987. A plaintiff does not need to show "precise equivalence in culpability between employees," but rather that the employees engaged in misconduct of "comparable seriousness." *Hollins,* 188 F.3d at 659. In order to be deemed "similarly situated," "the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Mitchell v. Toledo Hosp.,* 964 F.2d 577, 583 (6th Cir. 1992)(citation omitted).

First, Plaintiff alleges that Kenneth Longton, a white male, was similarly situated to plaintiff but was not suspended when the Mount Pleasant Center, the mental health center at which Longton was a director, came under an "ongoing homicide investigation." Plaintiff points out that instead of being suspended, Longton was transferred to the Caro Center, a different mental health facility, and that Longton's reassignment was extended several times. Both Plaintiff, as well as Longton were subject to the supervision of Deputy Director Patrick Barrie. Defendant does not appear to dispute these factual allegations. Although Plaintiff offers no specific arguments that he and Longton were under investigation for misconduct of "comparable seriousness," Plaintiff references Barrie's sworn deposition testimony from which it is apparent that the homicide investigation was taken very seriously. Deposition of Patrick Barrie at 50.

Second, Plaintiff alleges that he was declined a promotion in favor of Cynthia Kelly. Plaintiff offers no conclusive evidence showing that he was more qualified than Kelly, however Defendant apparently concedes that Plaintiff possessed the minimum qualifications for the SBA

16

18 position in 2008. Plaintiff has demonstrated that he was similarly situated to Cynthia Kelly with respect to the promotion for which he was declined.

There is a genuine issue of material fact as to whether Plaintiff has made out a prima facie case, such that summary judgment in favor of Defendant is improper

### d. Legitimate, Nondiscriminatory Reasons/Pretext

As discussed above, a genuine issue of material fact exists as to whether Defendant's proffered legitimate, nondiscriminatory reasons constitute pretext.

## IV. CONCLUSION

Accordingly,

**IT IS ORDERED** that Defendant's Motion for Summary Judgment [**Docket No. 28, filed on December 2, 2009** ] is **DENIED.**


S/Denise Page Hood
Denise Page Hood
United States District Judge

Dated: September 30, 2010

I hereby certify that a copy of the foregoing document was served upon counsel of record on September 30, 2010, by electronic and/or ordinary mail.

S/William F. Lewis
Case Manager